UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN RAY, | Case No. 2:22-cv-06925-PA (ADS) |
| Petitioner, | |
| v. | REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| JEFF LYNCH, as Warden, California State Prison, Sacramento, | |
| Respondent. | |

This Report and Recommendation is submitted to the Honorable Percy Anderson, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California. For the reasons discussed below, the Petition for Writ of Habeas Corpus should be denied, and the action should be dismissed with prejudice.

## I.    <u>INTRODUCTION</u>

On September 26, 2022, Petitioner Sean Ray, a prisoner in state custody, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (the "Petition"), alleging six grounds for relief.  (Dkt. No. 1.)

On October 27, 2022, Respondent Jeff Lynch moved to dismiss the Petition and lodged relevant portions of the state court record.  (Dkt. Nos. 9, 10.)  On July 14, 2023, the District Court granted the Motion to Dismiss and instructed Petitioner to file an amended petition deleting unexhausted claims or a motion for a stay.  (Dkt. No. 21.)

On July 28, 2023, Petitioner filed a First Amended Petition for Writ of Habeas Corpus with an accompanying memorandum of points and authorities.  (Dkt. Nos. 22 ("FAP"), 22-1 ("Memo").)  On October 2, 2023, Respondent filed an Answer and lodged additional state court records relevant to Petitioner's claims.  (Dkt. Nos. 27, 28.)  On October 10, 2023, Petitioner filed a Traverse.  (Dkt. No. 30.)  The matter is ready for decision.

## II.    RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

### A.  **Prior Proceedings**

On August 1, 2019, a Los Angeles County Superior Court jury found Petitioner guilty of one count of first degree murder (Cal. Penal Code § 187(a)), four counts of attempted willful, deliberate and premeditated murder (Cal. Penal Code §§ 664/187(a)), and one count of shooting at an inhabited dwelling (Cal. Penal Code § 246), and the jury also found true firearm and gang enhancement allegations (Cal. Penal Code §§ 12022.53(b)-(e)(1), 186.22(b)(1)(C)).  (Dkt. No. 28, Lodged Record ("LD") 8, Clerk's Transcript ("CT") 1799-1810, 1840-45; Dkt. No. 28, LD 11, Reporter's Transcript ("RT") 3021-27.)  In addition, prior to trial, Petitioner pleaded no contest to 28 counts of robbery (Cal. Penal Code § 211) and two counts of possessing a firearm in a vehicle (Cal. Penal Code § 25400(a)(1)), and he admitted gang, firearm, and "on-bail" enhancement allegations (Cal. Penal Code §§ 186.22(b)(1)(C), 12022.1(a)(1), 12022.53(b), (c), (e)(1)).

(CT 2073-75; RT B48-B64.)  Petitioner was sentenced to a total term of 270 years to life in state prison.  (CT 2030-54.)[1]

Petitioner appealed his convictions and sentence to the California Court of Appeal (the "Court of Appeal").  (Dkt. No. 28, LD 12.)  In a reasoned opinion filed on March 12, 2021, and modified on April 2, 2021, the Court of Appeal reversed one of Petitioner's attempted murder convictions, reduced Petitioner's sentence to 230 years to life, and directed that a new abstract of judgment be issued but otherwise affirmed the judgment.  (Dkt. No. 10, LD 4); People v. Godbolt, et al., No. B302235, 2021 WL 939884, at *25-26 (Cal. Ct. App. Mar. 12, 2021), as modified on denial of reh'g (Apr. 2, 2021).[2]

The California Supreme Court denied review on June 30, 2021, "without prejudice to any relief to which [Petitioner] might be entitled after [the California Supreme Court] decides People v. Kopp, S257844."[3]  (Dkt. No. 10, LD 7.)

---

[4] Petitioner was tried jointly with Jaylin Godbolt and Branden Wise.  Godbolt and Wise were found guilty of first degree murder and four counts of attempted willful, deliberate and premeditated attempted murder and gang and firearm enhancement allegations were found true.  (CT 1787-98, 1811-14, 2069-71.)  Godbolt was also found guilty of shooting at an inhabited building.  (CT 1797.)  In addition, Godbolt pleaded no contest to 25 counts of robbery and admitted gang, firearm, and "on-bail" enhancement allegations.  (CT 2065-67; RT B48-B61.)  #

[5] For ease of reference the Court cites to Godbolt, 2021 WL 939884, at *1, throughout the remainder of this Report and Recommendation, rather than the lodged copy of the Court of Appeal opinion.#

[6] In Kopp, the California Supreme Court granted review on the following questions: "Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments?  If so, which party bears the burden of proof regarding defendant's inability to pay?"  People v. Kopp, 254 Cal. Rptr. 3d 637 (Cal. 2019).

## B.  Factual Background

After an independent review of the record, the Court adopts and restates here the factual background from the Court of Appeal's opinion. [4]  Godbolt, 2021 WL 939884, at *2-*9.

### 1. The Shootings

The fusillade of gunfire that killed Florencio Ramirez and nearly produced four more murders took place against the backdrop of long-standing hostile tensions between the 76 East Coast Crips gang and the Florencia 13, a Hispanic gang, on turf that was disputed between these two warring factions. [Petitioner, Godbolt and Wise] were members of the East Coast Crips, the 76 East Coast Crips being a subset neighborhood gang of the East Coast Crips.

The shootings took place on August 19, 2017, shortly after midnight on 77th Street near Parmelee Avenue.  A group of five on four bikes was proceeding south on Parmelee and turned on 77th Street.  They had been at the home of Nancy Orozco (Orozco) and Florencio Ramirez (Ramirez) and were on their way to another friend's house.  Orozco and Ramirez were on one bike. They were in the lead, followed by Manuel Jose Jimenez (Jimenez), Maria Alvarez (Alvarez), and Stephanie Gastelo (Gastelo).  After a short exchange with a person in a white Cherokee, Gastelo saw a black Honda with its bottom lights lit on 77th Street.  As Gastelo looked back, she saw the person in the left back come out of the Honda halfway and start shooting.  The shots were aimed at Gastelo.  She jumped off her bike after the first five shots and got between two cars; she felt she had been hit.  The Honda moved up and got closer to Gastelo and two more shots were fired.  Gastelo was hit in her buttocks and two more shots skinned her left elbow and left rib cage.

Alvarez saw three people in the Honda shooting.  They were the driver, the rear passenger and the front passenger who was firing out the window and over the hood of the car.  They were shooting in Gastelo's and Alvarez's direction.  Alvarez saw Jimenez run off on foot.  Once the shooters stopped firing at Gastelo, they started shooting at Ramirez and Orozco who were trying to get behind a car.  The Honda started to back up and Alvarez remembered thinking, "Oh, my God, we're dead.  We're dead."

Orozco heard four or five shots and then Gastelo was yelling that they were shooting.  Orozco was shot in her left buttock and she and Ramirez fell off

---

[7] See Crittenden v. Chappell, 804 F.3d 998, 1011 (9th Cir. 2015) (finding that a state court's factual findings are presumed correct unless "overcome . . . by clear and convincing evidence"); 28 U.S.C. § 2254(e)(1).#

4

the bike.  Ramirez said he had been shot and he appeared to be in pain. Ramirez died as a result of a single gunshot that entered his back.  He had "F13" tattooed on his body and was a member of the Florencia 13 gang.

### 2. *A prior altercation*
On August 8, 2017, two deputy sheriffs responded to a call reporting an illegal shooting on Parmelee Avenue.  The deputies found two .9-millimeter casings, two .40-millimeter casings, and a live .40-caliber round on the scene.

An Instagram posting by [Petitioner] on August 9, 2017, states that his car got shot up by the Florencia gang.  [Petitioner] was arrested on August 13, 2017, for a traffic violation and was found to be in possession of a .9-millimeter Taurus pistol.  The casings found on August 8, 2017, were found to have been fired by this pistol.  Other casings found on August 8, 2017, were found to have been fired by a gun in the possession of a Florencia 13 gang member.

### 3. *[Petitioner] is arrested in possession of a weapon used in the shootings*
Among other objects, four .9-millimeter casings were found on the scene of the shootings by a forensic identification specialist.

[Petitioner] was arrested on August 19, 2017, when he was spotted standing by the stolen Honda.  A .9-millimeter gun was found in the car.  The four .9-millimeter casings recovered from the scene of the shooting were fired from this gun.

### 4. *The investigation*
Detective Dean Camarillo (Camarillo) of the Los Angeles County Sheriff's Department was assigned to investigate Ramirez's murder.  Camarillo arrived at the scene of the shootings in the early morning hours of August 19, 2017, and oversaw the collection of evidence.

Camarillo had considerable experience with gangs and particularly with the Florencia 13 gang.  He was also familiar with the 76 East Coast Crips.  Over time, he became aware of the August 8, 2017 shooting involving [Petitioner] and a Florencia 13 gang member.  He learned that [Petitioner] and Wise lived near each other, close to the site of the shootings, and that there was a connection between the two men.  He also learned that Wise was in county jail.  He decided to proceed with what he called a "<u>Perkins</u> operation" with Wise.[5]

---

[8]#The Court of Appeal explained that a "<u>Perkins</u> operation" involves "placing an informant in a jail cell with the target defendant."  <u>Godbolt</u>, 2021 WL 939884, at *3, n. 9 (citing <u>Illinois v. Perkins</u>, 496 U.S. 292 (1990)).#

Camarillo listened to a telephone call made by Godbolt from the jail to a female on July 27, 2018. In the call, Godbolt stated that the "CRIP"—meaning the informant—got him.

### 5. *Wise's jailhouse statement*

Wise's questioning was conducted on January 8, 2018, at the downtown county jail facility in Los Angeles.

Camarillo testified that he gave the confidential informant, who was placed in the cell with Wise, "very little" information. This was because he did not want the informant to "feed" Wise any information. "I want it to come from the target and/or myself during the interview."

Camarillo explained how the topic of the August 19, 2017 shooting was raised with Wise: After a short while when Wise in the cell with the informant, Camarillo pulled "Wise from the jail cell, interview[ed] him about my current investigation, and then place[d] him back in. [¶] So under this type of setting, it's not so much what they tell me. I'm more interested in what they go back in the cell and tell the undercover operative." Camarillo referred to this as a "stimulation" to get the target to discuss the topic that the investigating officers want discussed.

Wise was placed in a cell with the confidential informant by the fictitious name of Stanley.

The session commenced with one of the officers asking whether anybody wanted something to eat. When the informant declined, the officers asked whether anyone wanted juice. The informant said that would "work" and then told Wise that he looked young. The officer said that Wise could be taken to the medical clinic and asked again if Wise wanted something to drink, Wise said yes and the officer offered orange juice and asked if Wise was diabetic. It appears that at this point the officer left.

The conversation between Wise and the informant started with the informant asking where Wise was from. Wise replied that he was from 76 East Coast. A general conversation ensued during which the informant projected the image of a man who knew and understood the criminal justice system.

Camarillo entered and said that he worked with sheriff's homicide and that they were investigating a homicide that happened last August and that Wise's name had come up. He asked Wise and the informant to "hang tight" until his partner got there. Wise said he didn't know what Camarillo was talking about. Camarillo said that was alright "big guy" and closed by saying, "Thank you, sir, I appreciate it." Camarillo left.

6

The informant told Wise to use his brain and figure out that somebody was "telling." The informant cautioned Wise not to "go in there blind" and consider whether whoever he was with was now in jail. The informant described how somebody was telling and that he, the informant, was "trying to help you out." Wise said he didn't know what Camarillo was talking about. Wise described an attempt to rob him.

The informant went on for a while about going to court. Wise said he didn't know what the police were talking about but the informant told him that they "know something" and that they had evidence. The informant now identified himself as an "OG," which means old gangster.

The informant pointed out that at the end of the day "they got you on a homicide." Wise should "use [his] mind" and consider such things as self-defense. Should Wise play the victim?

It was apparently at this point that Wise was taken out for the interview with Camarillo.

Upon his return to the cell, Wise said that the police were talking about a shooting. Wise said they had showed him pictures of a car. The informant told Wise that he had to "clear me up so I can help you" and that somebody was "telling on you."

Wise said that one of the cars was stolen and the other was "his," referring to [Petitioner]. The informant again said that somebody was snitching and described how the snitch would talk. The two men now talked about the man ([Petitioner]) with the car.

Wise identified [Petitioner] as the person with the car. He said a female ("bitch") was in the front seat, she was [Petitioner's] girl, and she was in jail.

The informant asked if there were two of them in the backseat and asked what happened to Wise's "burner." Wise said it jammed. Wise said the other person was Godbolt ("Jaylin"). The female's name was Sierra. The informant went into a tirade about snitching. Some conversation took place that is hard to follow but which led Wise to say: "I was in the backseat."

The informant speculated about Godbolt's motivations in becoming a snitch. The conversation turned to cars and then to a discussion of bail about which the two men appeared to disagree.

The balance of the recorded conversation contains nothing of note.

At some point during the recorded conversation, Camarillo removed Wise from the cell and subjected him to an interview that lasted 30 to 40 minutes. Camarillo told Wise he had witnesses who identified Wise as seated in the

7

rear passenger seat during the shooting on August 19, that they claimed that Wise was shooting out the window of the car, and who also identified Wise as being present at the shooting on August 8, 2017. Neither statement was true and Wise denied both charges.

Camarillo testified that he learned a great deal from the conversation between Wise and the informant. He learned that a stolen Honda was used in the shooting, that Wise was seated in the back passenger seat behind the driver, that a number of weapons were used, that Wise was unable to shoot with his gun because it wouldn't work, and that [Petitioner] and Godbolt were also present.

### 6. *Godbolt's jailhouse statement*

Godbolt was questioned on January 12, 2018. Camarillo used two undercover agents but otherwise used the same tactic of removing Godbolt at one point from the cell with the informants, questioning him and then returning him to the cell.

While being questioned by Camarillo, Godbolt was falsely told that his DNA had been found on the stolen car, which Godbolt denied. Godbolt also denied any knowledge of gangs and that he had been in the car at the time of the shooting.

Godbolt's session extends to nearly one hundred pages in the transcript. It commenced with Godbolt asking whether he was getting an "add-charge interview," which was a question the deputy sheriff who was present could not answer. One of the two informants, however, said that it was going to be an add-charge interview. Godbolt then identified himself as an East Coast Crip and acknowledged that "they" were trying to give him a life sentence for some robberies. The informant advised Godbolt to listen to what the police had to say. When asked about his case, Godbolt said he was there for 22 robberies and a home invasion. The informant told Godbolt to stay strong.

The two men then talked for a while about a female.

The informant asked Godbolt whether he had been on probation and Godbolt answered that he was told that he would get probation. Both of the informants discussed the 22 robbery charges Godbolt was facing. Godbolt said he was in a single-man cell and the informant said that was the best way to be. The talk between the two informants and Godbolt turned to guns. Godbolt said they were charging him with a gang enhancement. The informant said they could not charge him with a gang enhancement.

Godbolt said he was 19 and hoped to be out by the time he was 30. When Godbolt said that his state-appointed lawyer had come to see him three times, the informant said: "Hopefully, they throw you a sweet little deal."

8

The two informants discussed that Godbolt had not been in jail before. The discussion turned to food.

Camarillo appeared and introduced himself. He said that, as soon as his partner arrived, he wanted to talk to Godbolt about a murder that happened last year in Compton. Godbolt said, "All right." Camarillo left.

The informants noted that it was "homicide." One of the informants said that somebody threw Godbolt's name under the bus. The informant said somebody was telling. Godbolt responded "this shit is crazy." Godbolt said one of his "homeys" got caught with a gun and that "this shit got me shaking." Godbolt wished they would hurry up and talk to him. The informant said: "So you can know what the fuck is going on." The informant said he was speaking from experience that someone was telling; Godbolt agreed. The informant advised Godbolt to listen. The informant repeated this advice.

A long and largely unintelligible conversation between the two informants followed during which Godbolt appears to have been in the interview with Camarillo.

Godbolt reappeared and one of the informants asked if he was all right. Godbolt said yes, he was "straight." The informant asked if they were snitching and Godbolt said yes; people were saying "my name is in it." Godbolt said he was told his DNA was found. The informant asked who had been shot and Godbolt said it was "Florence." The informant asked "do you got a feeling of which one is the bitch, which one is the snitch," and Godbolt said yes. Godbolt said they had his DNA and had interviewed everybody but he wasn't telling them anything. The informant said, "You did right. Just listen."

Godbolt said they found no gun. The informant asked whose car it was. Godbolt said it was a stolen car. Godbolt said his "homey" went down for the stolen car and he knew the police questioned him first. The informant said that Godbolt's "crimie" was a "bitch" (referring to [Petitioner]), and Godbolt agreed.

Referring to the August 8 incident involving [Petitioner], Godbolt reported that they asked him whether he was with [Petitioner] but he said he did not remember.

The informant asked Godbolt whether he was with [Petitioner] "when they did the shit in that other car." Godbolt said yes. (This may have been the first reference to the August 19 shootings.) The informant said, "Oh, my God." Godbolt said they did not get the gun because he got rid of it.

Godbolt said the murder was five months ago.  He confirmed [Petitioner] was there also.  Godbolt said: "All three—all four of us.  The girl—the girl was with us in that car."  The informant asked: "All four of you are up in here?" Godbolt said yes.

Godbolt said they had been investigating the murder for six months and had "seen the stolen car … they see the stolen car hit the corner of the same block of this murder, so that's how they got the license plates, and they knew it was a stolen car."

The informant said you never know "which one is telling," and Godbolt said he knew who was telling.  Godbolt said when people get caught for murder, they start naming.  The informant said that they knew everybody who was there.  Godbolt agreed.  Godbolt said that the gun had been found in [Petitioner's] car.

The informant asked what kind of gun Godbolt was shooting.  Godbolt said it was a Glock 17 but he threw it away.  The informant asked how many people had gotten shot.  Godbolt replied that somebody died.  He went on to say: "I hit somebody for sure.  I hit somebody for sure that night."  The informant said, "Damn."  Godbolt said, "I think one person died."  The informant wanted to know if the police had asked about the gun.  Godbolt said that "all they got of me being in the car.  That's not good enough evidence. I could have been in the car a day before that."

Godbolt now related what happened to [Petitioner] later on the day of the shooting, i.e., when he was arrested in possession of the stolen Honda and was found to be in possession of the gun that was determined to have been used in the shooting.  The informant suggested that [Petitioner] had asked for a deal, and Godbolt agreed.

The informant said if Godbolt ran into [Petitioner], "you're going to fuck him up."  Godbolt said yes, and the informant said he would "beat the dog shit out of him."

The informant said that it was likely that [Petitioner] had told the police what everybody was shooting with.  Godbolt said that they had "ARs, revolvers, Glocks."  Godbolt said that "it was more than one gun shot when we all was in the car because we all had a burner … everybody had a pistol."  Godbolt volunteered the fact that Wise's gun jammed.

Godbolt said: "The girl was driving.  That girl was driving.  Me and cuz, we were hanging out the window.  We all hanging out the window."

The balance of the recording contains nothing of note.

### 7. *[Petitioner's] jailhouse statement*

[Petitioner] was questioned on January 17, 2018. In the course of questioning outside the cell, [Petitioner] was told that the police had his DNA in a stolen car and that a witness had stated that he committed the shooting on August 8. These were lies. Neither statement was true. [Petitioner] was also shown a fake photo lineup with his photograph circled. [Petitioner] denied involvement in both the August 8 and August 19 shooting.

The session with the informant opened with the informant saying that "they can't just add-charge you, n***, for some bull. What you in here for?" After the informant told him he looked 17 years old, [Petitioner] said he was 18. [Petitioner] repeated that the upcoming interview could turn "into a add-charge," which had him "hot." The informant said he was in jail because of a gun.

[Petitioner] said he was there for a home invasion and they were trying to "give me life. I can't take it." [Petitioner] identified himself as being from 76 East Coast. The informant said he was from Chicago.

The informant told [Petitioner] that "they fucking you all up, n***. They fucking you all youngsters these days, my n***."

Camarillo entered at this point. He introduced himself and asked [Petitioner] if he knew that Camarillo and his partner were coming. [Petitioner] said he didn't know, and Camarillo explained that he was from homicide and needed to "chop it up with you about a couple of things" and that he would explain everything to [Petitioner]. Camarillo evidently then left the cell.

The informant told [Petitioner] that somebody was "doing this" since [Petitioner] had been in jail for three months and they were now coming to talk to him. [Petitioner] was in segregation ("K-4"). The informant said that "one of your n*** ain't solid." [Petitioner]: "I can't handle—I can't hold it. Fuck, I can't hold that. I can't handle that. N*** be fighting murders for five years. That's out." The informant asked [Petitioner] if his "n*** are silent," and [Petitioner] said no. The informant: "On a homicide?" [Petitioner]: "I don't fucking know." The informant told [Petitioner] he was young and that he hadn't "even seen life yet." [Petitioner] said he was being kept away from his n***.

The informant told [Petitioner] that they would "try to hit you young n*** upside the head, n***, blindside." [Petitioner]: "It got to be my crimie then." The informant said that "n*** ain't solid" and that the closest one to [Petitioner] would be the "first one to tell." [Petitioner]: "They cannot add charge. I pray to God. Please, God, please." The informant: "I'll tell you

don't even talk to these motherfuckers." The informant advised [Petitioner] to talk to the police in order to find out what was going on.

Camarillo entered the cell and told [Petitioner] that they were waiting for an interview room and that the wait should not take long. Camarillo added: "Your name came up in a murder, so we'll see how it goes. Okay?" [Petitioner]: "All right." Camarillo left the cell.

The informant asked how [Petitioner's] name came up in a murder. [Petitioner] wondered how his name came up and went on to say that there would probably be add-charges. The informant told him to sit back and think about what the police would be talking about and that he better be using his brain.

The informant said that the police could have DNA and that it wasn't necessarily a person who put his name to a murder. On the other hand, the informant said, you never know that it could be someone who was throwing him under the bus to get a sweet deal. When asked with whom [Petitioner] has a beef, [Petitioner] said he "didn't beef." The informant said that when the police was acting like Camarillo, they had something. He asked [Petitioner] if anyone he knew got "laid down." [Petitioner] said no, he didn't want an add-charge. [Petitioner] was taken out of the cell for the interview with Camarillo.

Back in the cell, [Petitioner] told the informant that he was told they had his DNA and that he would be charged. The police said they had talked to people in jail and on the outside. But the police said that they couldn't tell him "stuff" if he didn't tell them "stuff." The police said [Petitioner] was the last person they talked to. The informant told [Petitioner] that the police knew a lot more than they were telling him.

[Petitioner] said the police had a lineup and they "circled my face." But the informant said that if the police didn't have it, they would not file on him. [Petitioner] agreed.

The informant asked if they had shown him pictures. [Petitioner] said they had shown the car driving away. The informant asked [Petitioner] if he was in the car but didn't wait for an answer. He went on to say that someone was telling on [Petitioner]. The informant said he was 44 years old and experienced and the police were trying to railroad [Petitioner].

They then discussed that [Petitioner] was being kept away from his "crimie" and this meant that his crimie was telling on [Petitioner].

The informant said that the police were trying to railroad him and somebody was telling on him.

The informant said that he was going to try and give [Petitioner] a scenario "to get to flip it around." He asked whether "they" were Mexicans.

The informant asked if the police had found the car. [Petitioner] said yes, "they got the car." The informant said, "Go with self-defense." [Petitioner] said the police had his DNA in the car. Every name the police had was in jail.

The informant criticized [Petitioner] for not wearing gloves. [Petitioner] said they were going to file because of the snitch but [Petitioner] did not say anything to the police. The informant said there were ways "you can go around it."

An officer came into the cell to get [Petitioner's] fingerprints. When [Petitioner] asked, the officer said that he was being charged with "187 P.C. murder."

The informant said that the man was snitching. That's why he was asking whom they were shooting. [Petitioner] said they were walking down the street and "didn't shoot back" because they "didn't have a chance." The informant told [Petitioner] he would "need to switch the story all the way up." The informant: "Listen, that's why I'm asking you how—how did it go down, my n***, so I could tell you how to switch it up." [Petitioner]: "We just pulled up on them and started smacking on them and then drove off ... they were on bikes. They was coming down the street and they hit the corner, and we was going like this. I busted a U-turn and, 'Boom,' got on them."

The informant now advised [Petitioner] what to do: "This is what you do. You all go to court with this shit. Well, they filed on you. You all go to court. You already know it's the n*** telling on you. So you think they're going to look at you different if you—you all switch on him? You see what I'm saying? N***, the is telling on you, period. [¶] Hold on. N***, I'll switch it up. I'll be like, 'N*** going down the street. They get off. I'm driving. I tried to swerve. The next thing you know, this dumb-ass n*** hanging out the window getting off.' [¶] You just said you was driving, right? The n***—the n*** who is snitching, if he was smacking, obviously he wasn't driving, right? Nine times out of ten, they ain't supposed to be looking at the driver for shooting, my n***. If you're driving, but you got to look out where the fuck you're going, right? [¶] You didn't even know the n*** was about to get off. You hit the corner. Now this guy is tripping. They get off. You all getting—this n*** get off out there. You ain't know the motherfucker is about to get off. (INAUDIBLE.) You all just need to sit down and get you all shit together because as of right now it's looking bad for you all, my n***. You all need to us [sic] that shit as self-defense or something, but how are you going to get to this n*** that's a keep-away?" The informant elaborated on this advice by adding that [Petitioner] should say that he was made to drive the car.

13

A colloquy followed about where [Petitioner's] confederate was.

The informant asked [Petitioner] whether he got rid of the gun. [Petitioner] said he did not have it in his possession, it was in the car.

Nothing of note transpired during the remainder of this session.

***8. Gang evidence***
The East Coast Crips is one of the largest African-American gangs in the country with around a thousand members. Florencia 13, a predominantly Hispanic gang, has around two thousand members and is the East Coast Crips worst enemy. The war between these two gangs is particularly bloody and is considered the biggest gang war in Los Angeles.

There is no dispute that [Petitioner, Godbolt, and Wise] were active 76 East Coast Crips gang members.

Evidence was admitted that showed that Godbolt and [Petitioner] had committed robberies of other victims on July 20, 2017, and August 9, 2017.

Godbolt, 2021 WL 939884, at *2-*9 (footnotes omitted).

## III.    PETITIONER'S GROUNDS FOR RELIEF

Petitioner raises the following grounds for relief:

1.    Petitioner was denied the right to due process when the police illegally obtained his confession. (FAP at 14; Memo at 15-35.[6])

2.    Petitioner was denied the right to due process when the police attempted to get Petitioner's co-defendant, Godbolt, to talk about the offense by falsely convincing Godbolt that Petitioner was a snitch and inciting Godbolt to physically attack Petitioner. (FAP at 14; Memo at 35-41.)

3.    The admission of Petitioner's co-defendants' statements to informants violated Petitioner's right to due process and right to confrontation, as the statements

---

[9]‡All citations to electronically filed documents refer to the CM/ECF pagination.‡

14

1   were testimonial and did not fall within a firmly rooted hearsay exception.  (FAP at 15;

2   Memo at 42-46.)

3        4.    Petitioner was denied the right to due process when the trial court

4   imposed assessments, fines, and fees before determining his ability to pay.  (FAP at 15;

5   Memo at 46-47.)

6   **IV.    STANDARD OF REVIEW**

7        Generally, under the Antiterrorism and Effective Death Penalty Act of 1996

8   ("AEDPA"), a federal court may grant habeas relief to a state prisoner "with respect to

9   any claim that was adjudicated on the merits in State court proceedings" only if that

10  adjudication:

11       (1) resulted in a decision that was contrary to, or involved an unreasonable
         application of, clearly established Federal law, as determined by the
12       Supreme Court of the United States; or (2) resulted in a decision that was
         based on an unreasonable determination of the facts in light of the evidence
13       presented in the State court proceeding.

14  28 U.S.C. § 2254(d).  Overall, AEDPA presents "a formidable barrier to federal habeas

15  relief for prisoners whose claims have been adjudicated in state court."  Burt v. Titlow,

16  571 U.S. 12, 19 (2013).  AEDPA imposes a "'difficult to meet' and 'highly deferential'

17  standard for evaluating state-court rulings, which demands that state-court decisions be

18  given the benefit of the doubt."  Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (internal

19  citations omitted).

20       The AEDPA standard of review applies only to a state court's "adjudication on the

21  merits" of a state prisoner's federal constitutional claims.  See Lambert v. Blodgett, 393

22  F.3d 943, 971 (9th Cir. 2004).  A state court adjudicates a claim "on the merits" when it

23  decides on the basis of the substance of the federal claim advanced, rather than on a

24  procedural or other rule precluding state court merits review.  See Runningeagle v.

Ryan, 686 F.3d 758, 768-69 (9th Cir. 2012). A state court ruling that the petitioner failed to allege a prima facie case with respect to his federal claim is a determination on the merits. See Montiel v. Chappell, 43 F.4th 942, 957 (9th Cir. 2022). The petitioner bears the burden to show that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). In other words, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of that decision." Id. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Federal habeas corpus review thus serves as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Richter, 562 U.S. at 102-03 (internal quotation and citation omitted).

In applying the foregoing AEDPA standards, federal courts look to the last reasoned state court decision and evaluate it based upon an independent review of the relevant portions of the state court record. See Nasby v. McDaniel, 853 F.3d 1049, 1053 (9th Cir. 2017). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); Wilson v. Sellers, 584 U.S. 122, 125 (2018) ("[F]ederal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning."). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to

deny relief." <u>Richter</u>, 562 U.S. at 98, 102 ("a habeas court must determine what arguments or theories . . . could have supported[] the state court's decision" and "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent" with prior Supreme Court holdings).

Here, Grounds One through Four were denied on the merits by the Court of Appeal in a reasoned opinion. <u>See</u> <u>Godbolt</u>, 2021 WL 939884, at *11-*25. As the California Supreme Court summarily denied a petition for review raising Grounds One through Four (Dkt. No. 10, LD 7), the Court looks through the silent denial to the Court of Appeal's decision as the basis for the state court's judgment on Grounds One through Four. <u>See</u> <u>Ylst</u>, 501 U.S at 804; <u>Wilson</u>, 584 U.S. at 125. Because the state court adjudicated these claims on their merits, the Court's review is limited by AEDPA deference. <u>See</u> <u>Lambert</u>, 393 F.3d at 971; <u>Richter</u>, 562 U.S. at 100.

## V.    DISCUSSION

### A.    Petitioner's Statements (Ground One)

In Ground One, Petitioner contends that his statements to the confidential informant ("CI") were not voluntary and were made in violation of his constitutional rights protected by <u>Miranda v. Arizona</u>, 384 U.S. at 436 (1966). (Memo at 15-35.)

#### 1.    Background

As noted above, on January 17, 2018, Detective Camarillo set up a <u>Perkins</u> operation in which Petitioner was placed in a holding cell with a CI and their conversations were recorded. (CT 984-1029; <u>see</u> <u>Perkins</u>, 496 U.S. at 292. At some point, while Petitioner was being interviewed by police, Petitioner invoked his right to counsel. (CT 1309); <u>Godbolt</u>, 2012 WL 939884, at *13. When Petitioner returned to his jail cell, his conversations with the CI continued. (CT 984-1029; RT 1822.) Detective

Camarillo conducted similar operations using informants with Wise on January 8, 2018, and Godbolt on January 12, 2018. (CT 840-983.)

Before trial, Petitioner moved to exclude the statements he and his co-defendants made during the <u>Perkins</u> operations and his co-defendants filed similar motions. (CT 831-39, 1030, 1095-97, 1307-16.) The prosecution opposed these motions. (CT 1098-1306, 1317-98.) The trial court denied the motions and the statements made by Petitioner, Godbolt, and Wise during the <u>Perkins</u> operations were admitted at trial. (RT B2-B19, 1579-81, 1585-92, 1808-30.) The trial court explained that the statements did not involve custodial interrogations, the statements were not testimonial hearsay, and the statements qualified under the statements against interest (Cal. Evid. Code § 1230) exception to the hearsay rule. (RT B11-B13, B19.)

## 2. <u>Voluntariness of Petitioner's Statements</u>

Petitioner contends that his statements made to the CI during the <u>Perkins</u> operation were involuntary because the interrogation tactics were "incredibly deceptive and coercive." (Memo at 25.) Petitioner asserts that his confession was coerced because he was only 18 years old, while the CI was over twice his age, physically imposing, and a reportedly high-ranking gang member with extensive experience with the penal system and authority to "order Petitioner's demise." (<u>Id.</u> at 25-26.) Petitioner claims that the CI and Detective Camarillo "worked in tandem to increase the psychological and physical pressure" on him. (<u>Id.</u> at 26.) Petitioner was moved within the jail six times in one week, roused at 3:00 a.m. in the morning, informed that he was being charged with murder, visited periodically in his cell by Detective Camarillo, told that Detective Camarillo would need to speak with him, and presented with "falsified and fabricated evidence suggesting that [he] was tied to homicide." (<u>Id.</u> at 26-27, 34.) Petitioner also

asserts that the CI aggressively demanded that he "tell him exactly what happened during the shooting" and stated that one of Petitioner's co-defendants had "snitched on him," "the police had more evidence implicating [him] than they revealed," and "the police would employ physical force if necessary to achieve Petitioner's compliance" with fingerprinting.  (Id. at 27.)

### a. **Court of Appeal's Opinion**

The Court of Appeal identified "three common denominators" in each of the Perkins operations:

> One.  The informants in each of the three encounters were able to persuade [Petitioner, Godbolt and Wise] that the informants were, even if not currently active, but at least former members of criminal street gangs.  This was materially furthered by the circumstance that at least one of the informants (there were two in Godbolt's case) was the same in at least two, if not possibly all three, encounters. The assumption of the personae of a criminal street gang member allowed the informants to voice strong support, as they did, for [Petitioner, Godbolt, and Wise] in all three encounters. In none of the three encounters did any one [ ] voice skepticism about the projected personae of the informants.  That is, in all three encounters [Petitioner, Godbolt and Wise] were persuaded that they were dealing with former, if not current, criminal gang members with substantial experience in the criminal justice system who were sympathetic to [Petitioner, Godbolt, and Wise].

> Two. [Petitioner, Godbolt, and Wise] contend on appeal that their statements were coerced through the application of psychological pressure. "[C]oercion can be psychological as well as physical."  Psychological coercion often takes the form of implied threats, as it allegedly did in this case.  As an example, Godbolt argues that he was afraid of being "add-charged" with the consequences of the shootings.

> The actual record of the encounters between [Petitioner, Godbolt, and Wise] and the informants, in which [Petitioner, Godbolt, and Wise] accepted the informants as sympathetic former or current criminal gang members, seriously undermines [the] claim that the informants threatened them in any way.  The informants uniformly and successfully portrayed themselves as former gangsters who were sympathetic to [Petitioner, Godbolt, and Wise] and who wanted to help [them]....

Three. In each of the three encounters the incriminating statements were made by [Petitioner, Godbolt, and Wise] well toward the end of the encounter. And the incriminating statements came in short bursts, often disconnected, and in conversation with the informants. This shows that it took some time for the informants in each instance to gain the confidence and trust of each of [Petitioner, Godbolt, and Wise] but, and this is the important point, in the end the informants did gain [Petitioner's, Godbolt's, and Wise's] trust and confidence. The reason [Petitioner, Godbolt, and Wise] made the incriminating statements that they ultimately made was that they believed that the informants could be of some help to them. In other words, the reasons for the statements were not the alleged threats but the informants' success in presenting themselves as helpful and knowledgeable criminal gang members.

Godbolt, 2021 WL 939884, at *15-*16 (citations omitted).

The Court of Appeal held that Petitioner's statements to the CI were voluntarily made:

[Petitioner] contends that his fear of being "add-charged" was used as a coercive tactic both by the police and the informant.

Wise had identified [Petitioner] as the person in the car from which the shots had been fired. There was therefore no doubt that [Petitioner] would be charged as a participant in the shooting. That there would be "add-charges" was therefore a fact and not a hypothetical threat that the police had no right to make. The due process clause required that [Petitioner] be advised of the charges against him.

It is perfectly understandable that [Petitioner] would be very concerned about being charged as a participant and/or actor in the shootings. As a participant in one homicide and four attempted murders, he had every reason to worry. The question is whether that concern translates into invalidating his confession made toward the end of this encounter with the informant.

The answer of course is no. A criminal actor's reasonable apprehension about the consequences of his misdeeds does not invalidate his confession.

[Petitioner] contends that the informant "pressured [Petitioner] to tell what happened and finally wore [Petitioner] down with his leading questions that fed [Petitioner] facts to affirm or correct." [Petitioner's] imaginative rendition of the informant's role omits to mention that the informant was trying to put together a story for [Petitioner] that would exonerate [Petitioner].

20

Thus, the informant [said]: "Listen, that's why I'm asking you how—how did it go down, my n***, so I could tell you how to switch it up." Now came [Petitioner's] fateful confession: "We just pulled up on them and started smacking on them and then drove off." What the informant meant by "switch[ing] it up" was made immediately clear when the informant advised [Petitioner], at some length to claim that he was only the driver of the car and that he had no idea that the others intended to shoot the people on the bicycles. In other words, the informant validated that his chosen role was to assist [Petitioner].

[Petitioner] also claims that his confession was the result of the informant's "skilled cross-examination-type questioning." We do not agree that [Petitioner] confessed because the informant was a skilled questioner. [Petitioner] confessed because he trusted the informant to give him advice about how to deal with the charges [Petitioner] was facing. Be that as it may, effective cross-examination is not the same as impermissible psychological coercion sufficient to invalidate a confession.

Citing two out of state cases decided by intermediate appellate courts, [Petitioner] contends that Camarillo's reliance on false documents should invalidate [Petitioner's] ultimate confession made to the informant.

Resort by the police to deception is not a subject favored by reviewing courts. In one of two venerable cases on this subject that seem to have stood the test of time, the California Court of Appeal has deplored such tactics as morally unjustified and not commendable but nevertheless permissible as not invalidating an ensuing confession. We agree with Connelly and with Witkin who writes that cases in other jurisdictions holding fraudulently obtained confessions in admissible "usually involve something more than fraud."

[Petitioner] confessed to the informant because he believed that the informant could help him if the informant knew the facts. Resort to deception by Camarillo, while not commendable in the abstract, did not invalidate the eventual confession since it is not likely to have led to an untrue statement nor was it the proximate cause of the confession. [Petitioner] would not have confessed if he did not trust the informant. Camarillo's resort to false documents was not the proximate cause of the eventual confession made in conversation with the informant.

While [Petitioner] exhibited substantial apprehension about the charges he was facing which, as we have noted, was perfectly reasonable, the topics that dominated the conversation was who was snitching and how [Petitioner] should react to charges that he was involved in the shootings. On the latter subject, the informant clearly placed himself in [Petitioner's] camp, noting that the police were trying to railroad [Petitioner]. That the informant was there to help [Petitioner] was made clear when he told [Petitioner] before

21

the latter's confession that he would advise [Petitioner] to "flip it around," an offer on which the informant certainly followed up, as we have noted.

As with Wise and Godbolt, [Petitioner's] eventual confession was the result of the informant's successful portrayal of a criminal gang member who was there to help [Petitioner]. It was a voluntary statement.

Godbolt, 2021 WL 939884, at *18-*19 (citations omitted). The Court of Appeal also determined that Detective Camarillo's "stimulation" tactic of interrupting Petitioner's jailhouse discussions with the CI to conduct a police interview was not fundamentally unfair, coercive or a violation of due process. Id. at *19-*20.

### b. **Federal Law**

The admission at trial of a defendant's involuntary confession violates due process. See Colorado v. Connelly, 479 U.S. 157, 163-64 (1986); Brown v. Horell, 644 F.3d 969, 979 (9th Cir. 2011) ("Involuntary or coerced confessions are inadmissible at trial, . . . because their admission is a violation of a defendant's right to due process under the Fourteenth Amendment[.]"). The test for determining whether a confession is involuntary is "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession[,]" taking into consideration "'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" Dickerson v. United States, 530 U.S. 428, 434 (2000) (citations omitted); Mickey v. Ayers, 606 F.3d 1223, 1233 (9th Cir. 2010). A statement is involuntary if it is "'extracted by any sort of threats or violence, (or) obtained by any direct or implied promises, however slight, (or) by the exertion of any improper influence.'" Hutto v. Ross, 429 U.S. 28, 30 (1976) (citation omitted); see also Arizona v. Fulminante, 499 U.S. 279, 287 (1991) (a "credible threat" of physical violence is sufficient to demonstrate coercion); United States v. Crawford, 372 F.3d 1048, 1060 (9th

Cir. 2004) (en banc) (coercion can result from "physical intimidation or psychological pressure"). Deception, however, "does not render [a] confession involuntary. . . as long as the decision is a product of the suspect's own balancing of competing considerations." United States v. Miller, 984 F.2d 1028, 1031 (9th Cir. 1993) (citation omitted); see also Crawford, 372 F.3d at 1060-61 ("Trickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises.").

### c. **Analysis**

The state court's rejection of Petitioner's claim that his statements to the CI were coerced and involuntary is not contrary to clearly established federal law or objectively unreasonable. See 28 U.S.C. § 2254(d)(1). In line with longstanding Supreme Court precedent, see Dickerson, 530 U.S. at 434, the Court of Appeal considered the totality of the circumstances surrounding Petitioner's statements to the CI and reasonably concluded that Petitioner's will was not overborne by physical intimidation or psychological pressure. See Godbolt, 2021 WL 939884, at *15-*19. Although Petitioner asserts that his statements were not voluntary based on his youth and the CI's intimidating characteristics, nothing in the record suggests that Petitioner was coerced into making a false confession. See, e.g., Gutierrez v. Cates, 2023 WL 3293362, at *8 (C.D. Cal. 2023) ("Although the informants were older and were connected to powerful members of the Mexican Mafia, those factors did not amount to a coercive physical or psychological threat."). The CI did not use threats or violence against Petitioner and did not make any promises. Nor is there evidence suggesting that the CI physically intimidated Petitioner or used pressure to obtain his confession. Rather, as the Court of Appeal found, the record supports the conclusion that the CI simply established himself

as a knowledgeable, criminal gang member who was offering help to Petitioner. Godbolt, 2012 WL 939884, at *15-*16, *18-*19. Indeed, the transcript reveals that Petitioner believed he was in the company of a cellmate, not a police informant. See (CT 984-1029.) Thus, a coercive atmosphere was lacking. See Perkins, 496 U.S. at 296.

Petitioner has also not shown that Detective Camarillo's "stimulation" technique of interrupting Petitioner's discussions with the CI and other tactics (i.e., moving Petitioner's jail cell six times in a week, rousing Petitioner at 3:00 a.m., and having the CI inform Petitioner he was being charged with murder; that Detective Camarillo had more evidence implicating Petitioner and would need to speak with him; and planting the idea that one of Petitioner's codefendants snitched on him) rendered his confession to the CI coerced. See Godbolt, 2021 WL 939884, at *20 ("there is nothing fundamentally unfair or coercive about the police interrupting a jailhouse conversation with an informant with a police interview."); see also Gutierrez, 2023 WL 3293362, at *11 ("The Court is not aware of any Supreme Court authority that creates an exception to Perkins by holding that the challenged interrogation tactic—i.e., using undercover jail-cell informants to elicit a confession between intervening police interviews—is coercive or otherwise unconstitutional.").

Finally, although Detective Camarillo presented Petitioner with fabricated evidence and false statements, "deception alone" will not render a confession involuntary. Ortiz v. Uribe, 671 F.3d 863, 872 (9th Cir. 2011); see also Crawford, 372 F.3d at 1060-61; Miller, 984 F.2d at 1031.

In sum, as the Court of Appeal reasonably concluded, Petitioner's confession to the CI was not involuntary or coerced. Godbolt, 2021 WL 939884, at *19. Accordingly,

Petitioner is not entitled to federal habeas relief on his claim that his statements to the CI were coerced and involuntary.  See 28 U.S.C. § 2254(d).

### 3.  Custodial Interrogation

Petitioner contends that the continued questioning by the CI after he invoked his right to counsel was coercive police activity that is precluded by Miranda, 384 U.S. at 436.  (Memo at 17-25.)

### a.  Court of Appeal's Opinion

The Court of Appeal held that the Perkins operation and Petitioner's statements to the CI did not violate Miranda because the questioning was "by an undercover agent or by a person other than a police officer or police investigator."  Godbolt, 2021 WL 939884, at *13-*14.  The Court of Appeal explained: "Miranda is not a free floating bulwark against unfair police tactics."  Id. at *14 (internal quotation and citation omitted).  "Miranda precludes coercive custodial interrogation, not all 'coercive police activity.'"  Id.

### b.  Federal Law

The Fifth Amendment's prohibition against self-incrimination requires police to inform a suspect that he has the right to the presence of an attorney before subjecting him to custodial interrogation.  See Miranda, 384 U.S. at 444–45.  If the suspect requests counsel, the interrogation must cease until an attorney is present.  Id. at 474.

In Perkins, the Supreme Court clarified that when a suspect makes statements "about their criminal activities in front of persons whom they believe to be their cellmates," those statements are considered voluntary.  Perkins, 496 U.S. at 298.  Thus, there "is no federal obstacle to their admissibility at trial."  Id. at 300.

### c. **Analysis**

The Court of Appeal's determination that Petitioner's statements to the CI did not implicate Miranda is not contrary to, or an unreasonable application of, "clearly established Federal law," as defined by AEDPA. 28 U.S.C. § 2254(d)(1). "[T]he Supreme Court has never 'squarely addressed' if the Fifth Amendment privilege against self-incrimination precludes law enforcement from using an informant to obtain incriminating statements from a suspect who has invoked his Miranda right to counsel." Grimes v. Phillips, 105 F.4th 1159, 1167 (9th Cir. 2024) (quoting Wright v. Van Patten, 552 U.S. 120, 126 (2008)). Under AEDPA, the state court's "adjudication of [an] issue not addressed by the Supreme Court cannot be contrary to, or an unreasonable application of, clearly established federal law." Stenson v. Lambert, 504 F.3d 873, 881 (9th Cir. 2007) (citing Kane v. Garcia Espitia, 546 U.S. 9, 9 (2005)); see also White v. Woodall, 572 U.S. 415, 426 (2014) (Section 2254(d)(1) "does not require state courts to extend [Supreme Court] precedent or license federal courts to treat the failure to do so as error.").

Moreover, Petitioner is challenging his confession to the CI, not statements made during his interview with police. (Memo at 15-25.) "It is the premise of Miranda that the danger of coercion results from the interaction of custody and official interrogation." Perkins, 496 U.S. at 297. "Conversations between suspects and undercover agents do not implicate the concerns underlying Miranda." Id. at 296; Connelly, 479 U.S. at 170 ("Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that."). Thus, there is no Miranda violation and "no federal obstacle" to the admission of Petitioner's statements at trial, where Petitioner was "unaware that he [was] speaking to a [police

26

agent] and [gave] a voluntary statement."  <u>Perkins</u>, 496 U.S. at 294, 300; <u>Miranda</u>, 384 U.S. at 478 ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.").  As discussed, Petitioner failed to establish that his confession to the CI was coerced or involuntary.

Accordingly, Petitioner is not entitled to federal habeas relief on his claim that his statements to the CI were obtained in violation of rights protected by <u>Miranda</u>, 384 U.S. at 478.  <u>See</u> 28 U.S.C. § 2254(d).

**B.  <u>Portrayal of Petitioner as a Snitch (Ground Two)</u>**

Petitioner contends that his right to due process was violated when an informant falsely convinced Godbolt that Petitioner was a snitch and incited Godbolt to physically attack Petitioner in an attempt to get Godbolt to talk about the offense.  (Memo at 35-41.)

**1.  <u>Court of Appeal's Opinion</u>**

The Court of Appeal found that the informant's use of deception and portrayal of Petitioner as snitch did not violate Petitioner's right to due process.  <u>Godbolt</u>, 2021 WL 939884, at *20.  It explained: "It is unfortunately the very nature of undercover investigation that it is deceptive.  There is no law or constitutional provision that required the informant to be truthful and transparent."  <u>Id.</u>  The Court of Appeal also found that Petitioner's claim that the informant encouraged Godbolt to assault Petitioner was "an exaggeration," as the informant eventually advised Godbolt to leave Petitioner alone.  <u>Id.</u>

**2.  <u>Analysis</u>**

Petitioner cites no Supreme Court precedent clearly establishing that a suspect's due process rights are violated when a confidential informant makes false statements

1   and encourages an attack on the suspect during an undercover operation involving a

2   different suspect.  See Van Patten, 552 U.S. at 125-26 (where no Supreme Court decision

3   "squarely addresses" issue, habeas relief under AEDPA is not warranted).  Thus, the

4   state court's rejection of this claim "cannot be contrary to, or an unreasonable

5   application of, clearly established federal law."  Stenson, 504 F.3d at 881; see also

6   White, 572 U.S. at 426.  But even assuming arguendo that Petitioner could establish

7   error based on the use of deception in Godbolt's Perkins operation, any error was

8   harmless given the other evidence establishing Petitioner's guilt.  See Brecht v.

9   Abrahamson, 507 U.S. 619, 637 (1993) (a trial error is "harmless" if it did not have a

10  "substantial and injurious effect or influence in determining the jury's verdict").  The

11  prosecution introduced at trial Petitioner's self-incriminating statements about the

12  shootings (CT 1007 (admitting that the police had the car that was used during the

13  shootings), 1015 ("We just pulled up on them and started smacking on them and then

14  drove off … They were on bikes…. I busted a U-turn and, 'Boom,' got on them")), Wise's

15  statement placing Petitioner in the car that was used in the shootings (CT 865, 869),

16  and circumstantial evidence linking Petitioner to the shootings (RT 1230-38, 1303-06

17  (Petitioner was arrested standing next to a stolen Honda in which there was a .9-

18  millimeter Glock handgun that had been used in the shootings).  Thus, any asserted

19  error did not have a substantial and injurious effect on the jury's verdict.  See Brecht,

20  507 U.S. at 637.

21          Accordingly, Petitioner is not entitled to federal habeas relief on Ground Two.

22  / / /

23  / / /

24  / / /

28

### C.  Godbolt's and Wise's Statements to Informants (Grounds One and Three)

In Grounds One and Three, Petitioner contends that the admission of Godbolt's and Wise's statements to informants violated his rights to confrontation and due process, as the statements were testimonial and did not fall within a firmly rooted hearsay exception.  (Memo at 30-34, 41-46.)

#### 1.  Confrontation Clause

##### a.  Court of Appeal's Opinion

The Court of Appeal held that Godbolt's and Wise's jailhouse statements to informants made during the Perkins operations did not implicate the Confrontation Clause because the statements were not testimonial.  Godbolt, 2021 WL 939884, at *20-*22.  It explained that "[t]he diffuse, wide-ranging and free-flowing conversations between the informants and [Godbolt and Wise] were not the equivalents of police interrogation.  Certainly, . . . the last thing [Godbolt and Wise] expected was for their statements to be repeated in court."  Id. at 21.

##### b.  Federal Law

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right. . . to be confronted with the witnesses against him. . . ."  U.S. Const., Amend. VI.  The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination."  Crawford v. Washington, 541 U.S. 36, 53-54 (2004); Davis v. Washington, 547 U.S. 813, 821 (2006).  The Confrontation Clause applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'"  Crawford, 541 U.S. at

51 (citation omitted); <u>Davis</u>, 547 U.S. at 823-24.  "'Testimony,' in turn, is typically a

solemn declaration or affirmation made for the purpose of establishing or proving some

fact." <u>Crawford</u>, 541 U.S. at 51 (citation and some internal punctuation omitted); <u>Davis</u>,

547 U.S. at 821 ("[a] critical portion of [<u>Crawford</u>'s] holding … is the phrase 'testimonial

statements.'  Only statements of this sort cause the declarant to be a 'witness' within the

meaning of the Confrontation Clause.").  Thus, nontestimonial statements do not

implicate the Confrontation Clause.  <u>See</u> <u>Giles v. California</u>, 554 U.S. 353, 376 (2008);

<u>Whorton v. Bockting</u>, 549 U.S. 406, 420 (2007).  Moreover, the Confrontation Clause

"does not bar the use of testimonial statements for purposes other than establishing the

truth of the matter asserted." <u>Crawford</u>, 541 U.S. at 59, n.9; <u>see also</u> <u>United States v.</u>

<u>Wahchumwah</u>, 710 F.3d 862, 871 (9th Cir. 2013) (<u>Crawford</u> "applies only to testimonial

hearsay, and 'does not bar the use of testimonial statements for purposes other than

establishing the truth of the matter asserted.'"(citation omitted)).  Additionally, a

Confrontation Clause violation is subject to harmless error analysis.  <u>See</u> <u>Delaware v.</u>

<u>Van Arsdall</u>, 475 U.S. 673, 684 (1986).  A Confrontation Clause violation is harmless,

and does not justify habeas relief, unless it had substantial and injurious effect or

influence in determining the jury's verdict.  <u>See</u> <u>Brecht</u>, 507 U.S. at 623; <u>Ocampo v. Vail</u>,

649 F.3d 1098, 1114 (9th Cir. 2011).

    In <u>Bruton v. United States</u>, 391 U.S. 123 (1968), the Supreme Court held that "a

defendant is deprived of his Sixth Amendment right of confrontation when the facially

incriminating confession of a nontestifying codefendant is introduced at their joint trial,

even if the jury is instructed to consider the confession only against the codefendant."

<u>Richardson v. Marsh</u>, 481 U.S. 200, 207 (1987); <u>Samia v. United States</u>, 599 U.S. 635,

639 (2023).  However, "only testimonial codefendant statements are subject to the

federal Confrontation Clause limits established in <u>Bruton</u>."  <u>Lucero v. Holland</u>, 902 F.3d 979, 988 (9th Cir. 2018); <u>see also</u> <u>Davis</u>, 547 U.S. at 821 ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.").

### c.  **Analysis**

Here, the Court of Appeal reasonably determined that Godbolt's and Wise's statements to the informants were nontestimonial and therefore admissible under the Sixth Amendment.  See <u>Godbolt</u>, 2021 WL 939884, at *19-*22.  Statements made unwittingly to a police informant and statements from one prisoner to another are "clearly nontestimonial."  <u>Davis</u>, 547 U.S. at 825; <u>see also</u> <u>Meraz v. Pfeiffer</u>, 2023 WL 177629, at *2 (9th Cir. 2023) (applying <u>Davis</u>, "it was not unreasonable for the California Supreme Court to determine that the [co-defendant's] statement [to the confidential informant] at issue was non-testimonial, and therefore admissible under the Sixth Amendment."); <u>United States v. Tucker</u>, 609 F. App'x 383, 385 (9th Cir. 2015) ("The statements to which Tucker objects on Confrontation Clause grounds were all statements made unwittingly to a government informant, so they are clearly nontestimonial and the Confrontation Clause does not apply.").  Godbolt's and Wise's statements to the informants are nontestimonial, as they did not know that their statements were being recorded and it is apparent that they did not anticipate that their statements would be used in a criminal proceeding against Petitioner.  <u>Godbolt</u>, 2021 WL 939884, at *21-*22; <u>United States v. Gouveia</u>, 468 F. App'x 793, 796 (9th Cir. 2012) ("Since Hernandez did not know his statements were being recorded by law enforcement and had no reason to expect that they would be used at his and Gouveia's prosecution, his statements are not testimonial and, therefore, are not subject to the

Confrontation Clause.").  Thus, the Confrontation Clause did not bar admission of Godbolt's and Wise's statements to the informants.

Accordingly, the state court's rejection of Petitioner's Confrontation Clause claim was not contrary to, or an unreasonable application of, clearly established federal law, and it did not involve an unreasonable determination of the facts.

### 2.  Statements Against Interest Exception to Hearsay (Ground Three)

Petitioner contends that the admission of Godbolt's and Wise's statements to the informants violated his right to due process because the statements were unreliable hearsay and did not fall within a firmly rooted exception to the hearsay rule.  (Memo at 45.)  Specifically, Petitioner argues that Wise's and Godbolt's statements did not qualify under the statements against interest exception (Cal. Evid. Code § 1230) because the statements "attempt[ed] to shift all the blame to Petitioner" and were not "against their own penal interests."  Id.

### a.  Background

The trial court found that the statements made by Godbolt and Wise during the Perkins operations were self-incriminating and admissible under the hearsay exception for statements against interest.  (RT B11-B13, B19 (citing Cal. Evid. Code § 1230).)  The trial court explained that Godbolt's and Wise's statements corroborated one another regarding the guns that were used in the shootings, the individuals in the car, and their belief that they were shooting at Florencia 13 gang members.  (RT B12-B13, B19.)

### b.  Court of Appeal's Opinion

The Court of Appeal found that the challenged statements were properly admitted as declarations against interest, as follows:

32

We do not agree with the claim that [Godbolt's and Wise's] statements were exculpatory. Each of the statements claimed to be exculpatory were inculpatory in that they showed that the person making the statement was present on the scene of the shooting. That is certainly inculpatory. That is also true of the statement that the Honda was a stolen car since it showed knowledge about the car that was used in the shootings.

Ultimately, [Godbolt and Wise] each [ ] acknowledged in some way their participation in the shootings and none of them tried to shift responsibility to another. While Godbolt referred to [Petitioner] as the "main one," he acknowledged, among other things, that he shot at least one person. That [Petitioner] was looked upon as the principal in the shooting shows that Godbolt had first-hand knowledge of the shooting. The trial court's ruling admitting the statements as declarations against penal interest was correct; there was no abuse of discretion.

Godbolt, 2021 WL 939884, at *22-*23.

### c.  **Federal Law**

Recently, the Supreme Court clarified that "clearly established law provide[s] that the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair." Andrew v. White, 145 S. Ct. 75, 83 (2025); see Payne v. Tennessee, 501 U.S. 808, 825 (1991) (holding that the Due Process Clause can in certain cases protect against the introduction of unduly prejudicial evidence at a criminal trial). On federal habeas review, "[t]he ultimate question is whether a fairminded jurist could disagree that the evidence 'so infected the trial with unfairness' as to render the resulting conviction or sentence 'a denial of due process.'" Andrew, 145 S. Ct. at 83 (quoting Romano v. Oklahoma, 512 U.S. 1, 13 (1994)). In answering this question, courts may consider whether there are "permissible inferences" that may be drawn from the evidence. Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998) (explaining that the admission of evidence can violate the Constitution "only when there are no permissible inferences the jury may draw from the evidence.") (citation and internal quotations omitted); Kipp v. Davis, 971 F.3d 939, 956 (9th Cir. 2020) ("[W]e

have found no due process violation where there were permissible inferences that the jury could draw from the challenged evidence."). Even if a federal constitutional error occurred, federal habeas relief is only warranted "if the petitioner can establish that the error resulted in 'actual prejudice.'" Kipp, 971 F.3d at 958 (quoting Davis v. Ayala, 576 U.S. 257, 267 (2015)); Brecht, 507 U.S. at 637. In other words, the federal court must have "'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict'" and "[t]here must be more than a 'reasonable possibility' that the error was harmful." Kipp, 971 F.3d at 958 (quoting Ayala, 576 U.S. at 268); Brecht, 507 U.S. at 637.

### d. **Analysis**

Petitioner fails to demonstrate grounds for habeas relief on this issue. First, to the extent Petitioner claims that the trial court's evidentiary rulings admitting Godbolt's and Wise's out-of-court statements were improper under state law, his claim is not cognizable on federal habeas review. See Estelle v. McGuire, 502 U.S. at 67-68 (1991) (correctness of state evidentiary rulings presenting only issues of state law not cognizable on federal habeas corpus review); Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) ("Simple errors of state law do not warrant federal habeas relief.").

Second, Petitioner has not shown that the admission of Godbolt's or Wise's statements to the informants—alone or in combination—amounted to a violation of due process. A "fairminded jurist" could conclude that the challenged statements were relevant and offered for a proper purpose. Andrew, 145 S. Ct. at 83; Richter, 562 U.S. at 101. As the Court of Appeal explained, the challenged statements were "central" to the convictions for murder and attempted murder and "certainly against their penal interest," as "Wise admitted that he tried to shoot but the gun jammed" and "Godbolt

34

said he hit somebody for sure." See Godbolt, 2021 WL 939884, at *22.  Furthermore,

the admission of the challenged statements under the hearsay exception for statements

against interest was at least reasonable because, as the Court of Appeal determined,

Godbolt and Wise did not shift the blame onto Petitioner and "the statements claimed to

be exculpatory were inculpatory in that they showed that the person making the

statement was present at the scene of the shooting," which is "certainly inculpatory."

Godbolt, 2023 WL 939884, at *22-*23 (explaining that each of the declarants

"acknowledged in some way their participation in the shootings and none of them tried

to shift responsibility to another").  Although Godbolt referred to Petitioner as the "main

one," Godbolt acknowledged that he shot at least one person.  Id. at *23.  This Court

must defer to the state courts' reasonable findings on this matter.  See Bradshaw v.

Richey, 546 U.S. 74, 76 (2005) (per curiam) ("a state court's interpretation of state law,

including one announced on direct appeal of the challenged conviction, binds a federal

court sitting in habeas corpus"); Hicks v. Feiock, 485 U.S. 624, 629-30 & n.3 (1988)

(interpretation of state law by state court, including interpretation announced by

intermediate appellate court, binds federal court in habeas proceedings).

Finally, even if the challenged statements were improperly admitted, Petitioner

cannot show that he was prejudiced, considering his own admissions about the

shootings and the circumstantial evidence linking him to the crimes, as discussed above.

(CT 1007, 1015; RT 1230-38, 1303-06.)  Thus, the admission of the Godbolt's and Wise's

challenged statements did not have "a substantial and injurious effect on the verdict."

Brecht, 507 U.S. at 623.

Accordingly, the state courts' rejection of Petitioner's claim was not contrary to,

and did not involve an objectively unreasonable application of, federal law and was not

1    based upon an unreasonable determination of the facts in light of the evidence

2    presented.  Petitioner is not entitled to federal habeas relief on this claim.  See 28 U.S.C.

3    § 2254(d).

4        **D.  Fines, Fees, and Assessments (Ground Four)**

5        Petitioner contends that he was denied his right to due process because the trial

6    court failed to determine his ability to pay before imposing assessments, fines, and fees.

7    (FAP at 15; Memo at 46-47.)

8        **a.  Court of Appeal's Opinion**

9        On direct review, the Court of Appeal found that the trial court reasonably

10   concluded that Petitioner had the ability to pay the fines and fees, which were minimal.

11   Godbolt, 2021 WL 939884, at *25.  Although the trial court did not hold a hearing on

12   Petitioner's ability to pay, the Court of Appeal found that remand for a hearing on

13   Petitioner's ability to pay fines and fees "would serve no purpose," as the issue of

14   whether a trial court must consider a defendant's ability to pay was pending before the

15   California Supreme Court.  Godbolt, 2021 WL 939884, at *25 (citing Kopp, 38 Cal. App.

16   5th at 47).

17       **b.  Analysis**

18       A petitioner may seek federal habeas relief from a state court conviction or

19   sentence "only on the ground that he is in custody in violation of the Constitution or

20   laws or treaties of the United States."  28 U.S.C. § 2254(a); Swarthout v. Cooke, 562 U.S.

21   216, 219 (2011) (per curiam).  Petitioner's claim challenging the imposition of fines, fees,

22   and assessments does not impact his ability to be released from custody and is,

23   therefore, not cognizable on federal habeas review.  See Bailey v. Hill, 599 F.3d 976,

24   980-981 (9th Cir. 2010) (finding that imposition of fine is insufficient to meet "in

custody" jurisdictional requirement set forth in 28 U.S.C. § 2254(a)); Williamson v. Gregoire, 151 F.3d 1180, 1183 (9th Cir. 1998) ("[C]ourts hold that the imposition of a fine or the revocation of a license is merely a collateral consequence of conviction, and does not meet the 'in custody' requirement.") (gathering cases).  Further, while Petitioner attempts to characterize the imposition of fines, fees and assessments without a hearing as a violation of his right to due process, Petitioner's conclusory reference to a due process violation is insufficient to transform a non-cognizable state-law issue into a cognizable federal claim.  See Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996) ("[A petitioner] may not, however, transform a state-law issue into a federal one merely by asserting a violation of due process."); Rivera v. Illinois, 556 U.S. 148, 158 (2009) ("A mere error of state law . . . is not a denial of due process." (internal quotation omitted)).

For the foregoing reasons, the state courts' rejection of this claim was neither contrary to, nor involved an objectively unreasonable application of, any clearly established federal law as determined by the United States Supreme Court.  28 U.S.C. § 2254(d).

## VI.    CERTIFICATE OF APPEALABILITY

For the reasons stated above, the Court finds that Petitioner has not shown that "jurists of reason would find it debatable whether": (1) "the petition states a valid claim of the denial of a constitutional right"; and (2) "the district court was correct in its procedural ruling."  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).  As such, it is recommended that a certificate of appealability be denied.

## VII.   RECOMMENDATION

Therefore, it is recommended that the District Judge issue an Order, as follows: (1) accepting this Report and Recommendation; (2) denying the Petition and dismissing

this action with prejudice; (3) denying a Certificate of Appealability; and (4) directing that Judgment be entered accordingly.

Dated:  June 9, 2025

_____/s/ Autumn D. Spaeth_____
THE HONORABLE AUTUMN D. SPAETH
United States Magistrate Judge